AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>924 Erbe Avenue, Dayton, Ohio 45417,<br>including any outbuildings, basements, garages, or<br>sheds located on its curtilage "Location 1" | Case No.  3:22MJ014 |

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 846 & 841(a)(1) | Conspiracy to possess with intent to distribute a controlled substance |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO Frederick Zollers, FBI
*Printed name and title*

Sworn to before me and signed in my presence via facetime.

Date: 1/12/22

*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, U. S. Magistrate Court
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Frederick Zollers, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am a sworn law enforcement officer in the State of Ohio for fifteen (15) years. I am presently a sworn member of the Montgomery County Sheriff's Office. I am currently assigned to the Federal Bureau of Investigation's (FBI) Southern Ohio Safe Streets Task Force (SOSSTF) as a Task Force Officer (TFO), I have received training in drug trafficking investigations and have participated in numerous narcotics-related investigations. I have also conducted numerous investigations related to the use and possession of firearms. Based on my training and experience, I am familiar with federal drug laws, and I am aware that it is a violation of Title 21, United States Code, Sections 841(a)(1) and 846 to knowingly and intentionally distribute and possess with intent to distribute controlled substances (including heroin, fentanyl, cocaine, and methamphetamine), as well as to conspire to do the same. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

   a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

   b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

   c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

   d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

1

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may

2

        include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.     Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.     The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.     Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.     Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.     I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

3

## PURPOSE OF AFFIDAVIT

2. I make this affidavit in support of applications for search warrants for the following residence and vehicles – namely:

    a. 924 Erbe Avenue, Dayton, Ohio 45417, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Location 1**"). **Location 1** is described more fully in Attachment A, which is incorporated herein by reference;

    b. 143 Grosvenor Avenue, Dayton, Ohio 45417, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Location 2**"). **Location 2** is described more fully in Attachment A-1, which is incorporated herein by reference;

    c. 2015 Cadillac ATS, Black in color, Ohio license plate number JNF5208, Vehicle Identification Number (VIN) 1G6AG5RX6F0116540 (hereinafter "**Vehicle 1**"). **Vehicle 1** is described more fully in Attachment A-2, which is incorporated herein by reference;

3. As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside **Location 1**, **Location, 2** and **Vehicle 1**– namely:

    a. Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

    b. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

4. A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable

4

cause to believe that the items listed in Attachment B will be found at/in the premises and vehicles described above. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located inside **Location 1, Location 2** and **Vehicle 1**.

## PROBABLE CAUSE

5. During the week of November 15, 2021, I received information from a Confidential Informant (hereinafter "CI") who provided information regarding a black male known as "Grams" selling fentanyl in the Dayton, Ohio area. The CI indicated "Grams" conducts vehicle-to-vehicle drug sales in the area of Germantown Street and Erbe Avenue. The CI said "Grams" drives a black Cadillac sedan and identified a residence on Erbe Avenue that the CI believed to be associated with "Grams." The CI provided a cellular phone number that he/she calls to purchase narcotics from "Grams." The residence was identified as 924 Erbe Avenue (hereinafter "**Location 1**"), located in the City of Dayton, Montgomery County, Ohio. The CI has not previously provided information to law enforcement, however the CI has proven to be reliable and credible, as described in this affidavit. I have been able to corroborate information that the CI has provided through independent investigation. The CI is providing information for monetary compensation.

6. After receiving the information, investigators researched **Location 1** through a law enforcement database and identified a male named John ELLIOTT to be associated with **Location 1**. ELLIOTT carries **Location 1** as his address through the Ohio Law Enforcement Gateway database. The CI was shown a picture of ELLIOTT obtained from a law enforcement database and the CI identified ELLIOTT to be "Grams." I am familiar with ELLIOTT from conducting a prior drug investigation. I arrested ELLIOTT in October of 2017 at which time

5

ELLIOTT was in possession of a loaded handgun and approximately 10 grams of fentanyl. ELLIOTT was charged through the Southern District Court of Ohio for violation of 18 U.S.C. § 922(g)(1) felon in possession of a firearm (case number 3:18-CR-64). ELLIOTT served a term of imprisonment, and he is currently on supervised release through the Southern District Court of Ohio. Additionally, ELLIOTT has a 2016 conviction for possession of heroin through Montgomery County Common Pleas Court.

7. On or about November 22, 2021, members of the RANGE Task Force, members of the FBI SOSSTF and I conducted a controlled purchase of suspected fentanyl using the CI and an Undercover Officer (hereinafter "UC"). The CI was searched for contraband before and after the controlled purchase. The CI placed a controlled call to "Grams" and arranged to purchase a quantity of fentanyl. The CI recognized the voice of the male on the phone to be "Grams." The male agreed to the sale and directed the CI to drive to the area of Limestone Avenue and Lenita Avenue. Task force members established surveillance at **Location 1** and observed a black Cadillac ATS bearing Ohio registration JNF5208 (hereinafter "**Vehicle 1**") parked on the street in front of the residence. Task force members observed **Vehicle 1** depart and drive toward the area where the UC and CI were directed to. **Vehicle 1** pulled alongside the UC and CI's vehicle and ELLIOTT provided the UC and CI with suspected fentanyl in exchange for documented buy-funds. Following the controlled buy, the UC and CI departed the area. Task force members continued surveillance at **Location 1** and observed the **Vehicle 1** arrive back at **Location 1** directly following the buy. The UC and CI identified ELLIOTT as the single occupant of **Vehicle 1** and the person who conducted the drug deal. A sample of the suspected fentanyl was field tested and the test indicated positive for fentanyl. The suspected fentanyl was submitted to the Miami Valley Regional Crime Laboratory to be analyzed for content and lab results are pending.

8. On November 30, 2021, at approximately 6:13 a.m., I conducted a spot check at **Location 1** and I observed **Vehicle 1** parked on the street in front of the residence. On December 1, 2021, at approximately 5:30 a.m., I conducted a spot check at **Location 1** and I observed **Vehicle 1** parked on the street in front of the residence. On December 2, 2021, at approximately 8:31 a.m., I conducted a spot check at **Location 1** and I observed **Vehicle 1** parked on the street in front of the residence.

9. On or about December 2, 2021, members of the RANGE Task Force, members of the FBI SOSSTF and I conducted a controlled purchase of suspected fentanyl using the CI and a UC. The CI was searched for contraband before and after the controlled purchase. The CI placed a controlled call to "Grams" and arranged to purchase a quantity of fentanyl. The CI recognized the voice of the male on the phone to be "Grams," previously identified as ELLIOTT. ELLIOTT agreed to the sale and directed the CI to drive to the area of Eleanor Avenue and Home Avenue. Task force members established surveillance in the area and observed **Vehicle 1** already parked on Eleanor Avenue near Home Avenue. The UC and CI pulled alongside the **Vehicle 1** and ELLIOTT provided the UC and CI with suspected fentanyl in exchange for documented buy-funds. During the exchange, ELLIOTT told the UC and CI he could get various narcotics, including heroin, crack, crystal, and Perc-30 pills. Following the controlled buy, the UC and CI departed the area. The UC and CI identified ELLIOTT as the single occupant of **Vehicle 1** and person who conducted the drug deal. A sample of the suspected fentanyl was field tested and the test indicated positive for fentanyl. The suspected fentanyl was submitted to the Miami Valley Regional Crime Laboratory to be analyzed for content and lab results are pending.

10. On December 14, 2021, pursuant to a state search warrant authorized by the Honorable Montgomery County Common Pleas Court Judge Richard Skelton, I installed a Global

7

Positioning System (GPS) on **Vehicle 1**. The GPS was installed while **Vehicle 1** was parked on the roadway in front of **Location 1**. Following the installation of the GPS on **Vehicle 1**, I have conducted several spot checks during early morning hours at **Location 1** during the months of November/December 2021 and January 2022. During each spot check, I observed **Vehicle 1** parked in front of **Location 1**, which corroborates with GPS location data provided by the GPS installed on **Vehicle 1**.

11. On or about December 14, 2021, members of the RANGE Task Force, members of the FBI SOSSTF and I conducted a controlled purchase of suspected fentanyl and suspected methamphetamine using the CI and a UC. The CI was searched for contraband before and after the controlled purchase. The CI placed a controlled call to "Grams" and arranged to purchase a quantity of fentanyl and a quantity of methamphetamine. The CI recognized the voice of the male on the phone to be "Grams," previously identified as ELLIOTT. ELLIOTT agreed to the sale and directed the CI to drive to the area of Eleanor Avenue and Home Avenue. Task force members had previously established surveillance at **Location 1**, where **Vehicle 1** was parked in front of the residence. Detective Anthony Hutson observed **ELLIOTT** walk from the direction of the front door of **Location 1** and enter the driver's seat of **Vehicle 1**. ELLIOTT departed **Location 1** in **Vehicle 1**.

12. Task force members utilized the GPS installed on **Vehicle 1** to surveil ELLIOTT's direction of travel. ELLIOTT drove directly to the area of Ingomar Avenue and Grosvenor Avenue. Task force members drove by the area where the GPS indicated **Vehicle 1** was parked and observed **Vehicle 1** parked in the area of Ingomar Avenue and Grosvenor Avenue. After being parked for only a few minutes, GPS location data indicated **Vehicle 1** departed the area of Ingomar Avenue and Grosvenor Avenue. ELLIOTT drove directly to where the UC and CI were

parked on Eleanor Avenue at Home Avenue. ELLIOTT pulled alongside the UC and CI's vehicle and provided the UC and CI with suspected fentanyl and suspected methamphetamine in exchange for documented buy-funds. Following the controlled buy, the UC and CI departed the area. The UC and CI identified ELLIOTT as the single occupant of **Vehicle 1** and person who conducted the drug deal. A sample of the suspected methamphetamine was field tested and the test indicated positive for methamphetamine. The suspected fentanyl and methamphetamine were submitted to the Miami Valley Regional Crime Laboratory to be analyzed for content and lab results are pending.

13. Following the controlled buy, task force members utilized the GPS location data to surveil ELLIOT's direction of travel. ELLIOT drove directly back to **Location 1** and parked **Vehicle 1** in front of **Location 1**. ELLIOTT exited the **Vehicle 1** and walked toward the direction of the front door of **Location 1**.

14. On or about January 4, 2022, members of the RANGE Task Force, members of the FBI SOSSTF and I conducted a controlled purchase of suspected methamphetamine using a UC. The UC placed a controlled call to ELLIOTT and arranged to purchase a quantity of methamphetamine. During the call ELLIOTT agreed to the sale and told the UC that he (ELLIOTT) needed to call his brother and make sure he was at the house and then he was about to grab it. ELLIOTT directed the UC to drive to the area of Eleanor Avenue and Home Avenue. Task force members had previously established surveillance at **Location 1**, where **Vehicle 1** was parked in front of the residence. Detective Samuel Hemingway observed ELLIOTT walk from the direction of the front door of **Location 1** and enter the driver's seat of **Vehicle 1**. ELLIOTT departed **Location 1** in **Vehicle 1**.

15. Task force members utilized the GPS location data to surveil ELLIOTT's direction of travel. ELLIOTT drove directly to the area of Ingomar Avenue and Grosvenor Avenue. Prior to ELLIOTT departing **Location 1**, Special Agent (SA) Robert Buzzard established surveillance in the area of Grosvenor Avenue and Ingomar Avenue. While SA Buzzard was surveilling the area of Grosvenor Avenue and Ingomar Avenue, SA Buzzard observed a black male driving a black Ford F-150 arrive and park in front of 143 Grosvenor Avenue (hereinafter **Location 2**). **Location 2** is located at the intersection of Grosvenor Avenue and Ingomar Avenue and in the area where ELLIOTT parked during the controlled buy on December 14, 2021.

16. ELLIOTT drove directly to the area of Grosvenor Avenue and Ingomar Avenue. SA Buzzard observed ELLIOTT arrive and park **Vehicle 1** near where the male in the Ford F-150 was parked. ELLIOTT exited the **Vehicle 1** and the male exited the Ford F-150. ELLIOTT and the male then entered the front door of **Location 2**. Minutes later ELLIOTT exited the front door of **Location 2** and departed in **Vehicle 1**. Based on training and experience, I know ELLIOTT's short term traffic at **Location 2** is consistent with drug trafficking activity. ELLIOTT drove directly to where the UC was parked on Eleanor Avenue near Home Avenue. ELLIOTT pulled alongside the UC's vehicle and ELLIOTT provided the UC with suspected methamphetamine in exchange for documented buy funds. Following the controlled buy the UC departed the area. A sample of the suspected methamphetamine was field tested and the test indicated positive for methamphetamine. The suspected methamphetamine was submitted to the Miami Valley Regional Crime Laboratory to be analyzed for content and lab results are pending.

17. Following the controlled buy, task force members utilized GPS location data to surveil ELLIOTT's direction of travel. ELLIOTT drove directly back to **Location 1** and parked **Vehicle 1** in front of the residence. Task force members observed ELLIOTT exit **Vehicle 1** walk

toward the front door of **Location 1**. Minutes later task force members observed ELLIOTT exit the front door of **Location 1** and walk toward **Vehicle 1**.

18. Investigators searched the address of **Location 2** through law enforcement databases and identified a male named Alvin Spencer to be associated with the residence. Spencer carries **Location 2** as his address through the Ohio Law Enforcement Gateway database. SA Buzzard reviewed a picture obtained from a law enforcement database of Spencer and advised Spencer matches the physical description and characteristics of the male he observed driving the Ford F-150 who met ELLIOTT and entered **Location 2** during the controlled buy on January 4, 2022. Pursuant to a subpoena, I learned that Spencer has active utilities at **Location 2**.

19. SA Buzzard spoke with a Confidential Source (hereinafter "CS"). CS has provided SA Buzzard truthful and reliable information in the past, which has been verified through independent investigation. Information provided by the CS has resulted in the seizure of large quantities of narcotics and the successful prosecution of drug traffickers. CS personally knows Spencer and reported Spencer sells illegal narcotics. CS knows Spencer resides at **Location 2** and has observed Spencer mixing illegal narcotics inside **Location 2** in the past. Spencer has prior felony convictions through Montgomery County Common Pleas Court for F4 Possession of Cocaine (case number 2005CR02966) and F4 Possession of Heroin (case number 2014CR0111). Following the controlled buy on January 4, 2022, I have conducted several spot checks during early morning hours a **Location 2**. Each time I observed the black Ford F-150 parked in front of **Location 2**.

20. Based on training and experience and conversation between ELLIOTT and the UC while arranging the controlled buy on January 4, 2022, I suspect ELLIOTT traveled to and entered **Location 2** to obtain the suspected methamphetamine that he sold to the UC on January 4, 2022.

I have conducted previous drug investigations where drug dealers travel to "stash locations" to obtain drugs for a drug transaction. The term "stash location" refers to a location where drugs area processed, stored and distributed.

21. After installation of the GPS on **Vehicle 1** and the controlled buy from ELLIOTT on December 14, 2021, I have continued to monitor GPS location data and review electric records of the GPS tracker installed on **Vehicle 1**. Through such review, I observed that Vehicle 1 travels to and parks in the area of Grosvenor Avenue and Ingomar Avenue nearly every day at different hours of the day since December 14, 2021, sometimes several occasions in the same day. For example, GPS location data indicated that **Vehicle 1** traveled to and parked in the area of Grosvenor Avenue and Ingomar Avenue on January 9, 2022, remaining in the area of approximately forty minutes. Additionally, on January 10, 2022, GPS location data indicated that **Vehicle 1** traveled to and parked in the area of Grosvenor Avenue and Ingomar Avenue twice remaining in the area for approximately several minutes each time. Based on training and experience, I know that short term vehicle traffic at residences is consistent with drug trafficking activity.

//

//

//

12

## CONCLUSION

22.     Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within **Location 1, Location 2**, the surrounding curtilage and inside **Vehicle 1**.

Frederick Zollers
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed before me on this
__12th__day of January, 2022.

Sharon L. Ovington
United States Magistrate Judge

## ATTACHMENT A

**Location 1:** The place to be searched is 924 Erbe Avenue, Dayton, Ohio 45417 and the surrounding curtilage. 924 Erbe Avenue, Dayton, Ohio is single story single-family residence constructed of yellow siding. No visible numerals are affixed to the residence. The Affiant can identify the residence on sight. 924 Erbe Avenue is further depicted in the following photograph.



## **ATTACHMENT B**

### **PROPERTY TO BE SEIZED**

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine and fentanyl and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.